Thank you, Your Honor. Eric Brunstad on behalf of Appellant Elaine Marshall as Trustee of the Trust. In the time that I have this morning, I would like to concentrate on our argument that the bankruptcy petition should have been dismissed for bad faith. And I'd like to start with the point that the bankruptcy judge completely got the legal standard wrong. In a series of decisions, the Supreme Court and this Court has said what factors are relevant and important, and point by point, the bankruptcy court took the opposite view. Because the bankruptcy court applied the wrong legal standard, this is reviewed de novo rather than for abuse of discretion. And under the correct legal standard, the bankruptcy petition should have been dismissed. The first one, whether the debtors were solvent or not. In ER 89, the bankruptcy judge said that's irrelevant, quote-unquote, and quote-unquote, it's entitled to no weight. Well, this Court in the Marsh decision in 1994 found that to be nigh near dispositive. The fact that a solvent debtor facing a $2.5 million restitution judgment who could have paid it out of her holdings, who would have to liquidate some assets, that combined with the fact that the timing was just before enforcement, that was bad faith. So the bankruptcy judge erred on that point. The second point, ER 90, the bankruptcy judge said that the various misrepresentations and omissions in the schedules was immaterial and it's not important to give an accurate asset valuation in the schedules. Well, that again is dead wrong. In the Marama case in 2007, a case I argued successfully in the Supreme Court, Justice Stevens pointed out for the Court, in fact, that when you don't disclose your assets or you omit them, that is grounds for forfeiting any relief under bankruptcy. This case in the Leavitt case decided the same thing. This important material consideration, it's not immaterial, as the bankruptcy judge concluded. ER 90, the bankruptcy judge said, you know, if you have a State court fraud judgment against you, you can file for bankruptcy relief. That's not really that important either. Again, Marama decision is to the contrary. This Court's decision in Marsh is to the contrary. St. Paul Storage, this Court's decision, this Court's decision in Leavitt, again, all to the contrary. ER 94, there's nothing wrong with the timing in this case, the bankruptcy court found. Two days before the hearing on enforcement of the State court fraud judgment, the marshals filed for bankruptcy. And the bankruptcy judge said, that's fine. Although in this case, in this Court, I'm sorry, in the Marsh decision against St. Paul Storage, the Silberkraut's decision, this Court said, all of that is, that's highly relevant. It's not something you can just brush aside. On page 93 of the excerpts of the record, the bankruptcy judge said, the fact that there's a confirmable Chapter 11 plan, well, that would cure the taint of there being any problem with the schedules and things like that. Again, this Court's decision in Marsh said no. If there is bad faith, immediate dismissal is what must happen. Again, the bankruptcy judge got it dead wrong. Same thing in Marama. The Supreme Court of the United States said, if there's bad faith, you forfeit a right to bankruptcy relief. So counsel, you're going really fast. But let's talk about the Marsh case for a second. Yes, Your Honor. Isn't that distinguishable from the situation here? There, the Court, Marsh is the case you're principally relying on for bad faith, right? Not exclusively, Your Honor. We're relying on a series of cases. I said principally. Yes, principally because that's the most similar, although the Valisquez case is also right on point. And they're the same judge decided on basically the same facts, the opposite. It was a bad faith filing. I'm just trying to have to understand this. Yes, Your Honor. In the Marsh case, it seemed that there was a finding that the debtor could satisfy the judgment with nonbusiness assets. Correct, Your Honor. That's not the same situation here, is it? The judge, below, refused to make that finding, Your Honor. Here, Judge Bufford studiously said, I'm not going to decide whether the marshals have the means to satisfy this judgment or not. He said, I'm not going to decide whether they're solvent or not. Wasn't there a finding that they couldn't possibly have posted the supersedious bond in order to appeal from the Texas probate judgment because that would be 150 percent of the judgment and they would have to liquidate almost all their assets? Your Honor, that conclusion was clearly erroneous. That's on ER 95. But he did make that finding. Not quite, Your Honor. What he said is that because he didn't say, start from the premise that in the beginning of the year, in 2002, the marshals filed an affidavit in the probate court saying their assets were worth $22 million. And they had liabilities of a couple million dollars, mostly secured debt on their homes. So the bankruptcy judge refused to make a finding as to what the value of their assets were. But that was what they swore to in the probate court at the beginning of 2002. All that the trusts were asking for in the probate court, and this is at footnote 9 of the bankruptcy judge's opinion, ER 95, was a $10.4 million bond. Less than half of the value of their assets in the beginning of 2002. They could have, if they had liquidated their stock portfolio and their bond portfolio, it would have been more than enough to satisfy the bond. The same thing in Marsh. Mrs. Marsh didn't have liquid assets to satisfy the judgment. Mrs. Marsh had to sell her assets to do it. And this Court said it doesn't matter. That she could satisfy it with non-business assets. The same thing here. These are personal non-business assets of the Marshals, individually. It's the same case as in Boynton. In Boynton, they had a the debtors had a $5 million investment account. They had some real estate. And they faced an IRS judgment for taxes that they didn't pay. And the question was, could they file for bankruptcy? And the answer properly was no. Because they had lots of assets, including this $5 million investment account, to at least pay part of it. They were probably insolvent in the Boynton case. Here, the Marshals are solvent. The only ---- I struggle, Counsel, to really understand the premise of your argument, being that the Bankruptcy Court failed to correctly apply the law. It seems to me that he went through the various factors. You just don't like his findings of fact. No, Justice Kagan. And so it then triggers a different standard of review in talking about the misrepresentation of assets. He made specific findings regarding the amended schedule. He also talked about whether there was an improper purpose or not, the fact that the debtors couldn't have anticipated that Pierce Marshall wouldn't file the proof of claim at that point. They had at one point accounted for taking care of the fraud judgment. But in the end, when Mr. Marshall, Pierce Marshall, didn't file the proof of claim, he wasn't entitled to proceed. So it seems like the Bankruptcy Court went through all of the various factors that would go to a bad faith analysis in connection with the motion to dismiss, and he made certain findings, and you're disputing that. Well, no, Judge Wenin, here's why. On ER 89, for example, I'm quoting the Bankruptcy Judge's opinion. He said whether the debtors were solvent or not is, quote, irrelevant, close quote, and entitled to, quote, no weight, close quote. When, in fact, that same factor was by dispositive in the Marsh case. So the fact that he said it's entitled to no weight, but this Court has actually given it great weight, that's a misapplication of the law. He said on ER 90, the misrepresentations in the schedules, and it's undisputed there were misrepresentations. They didn't disclose a $6 million asset in their initial schedules, for example. They didn't disclose various things. He said these misrepresentations are, quote, immaterial, close quote. And it's not important to give an accurate asset valuation. That was his application of the standard. That is dead wrong as a matter of law. Now, we're reviewing Judge Carter's order, right? No, Your Honor. Judge Carter's order, under this Court's preference being an intermediate appellate decision, is entitled to no deference. We're looking at Judge Buffert's findings and Judge Buffert's conclusions. That's what I am citing to in the excerpts of the record. Okay. You're right. There's a strange bankruptcy review rule here, right? Yes, Your Honor. But the Decker case of this circuit establishes quite clearly Judge Carter's opinion is entitled to no deference. You basically disregard it. You look at the decision of the bankruptcy judge, which is what I am focusing on. So no judgment. The bankruptcy judge did not apply the correct standard of law. He considered to be irrelevant or immaterial or unimportant things which this Court and the Supreme Court has said are dispositive. The fact of misrepresentations in the schedules alone in trying to hide assets, the Supreme Court concluded in the Murama case in 2007, that was enough to support forfeiture of bankruptcy relief. That's Justice Stevens's words for the Supreme Court. Of course, was the standard there that forfeiture was compelled or simply that that would have supported a discretionary decision to forfeit? The Supreme Court's language in Murama, Your Honor, was much stronger than that. This is what Justice Stevens actually said. An issue that has arisen with disturbing frequency is whether a debtor who acts in bad faith prior to or in the course of a bankruptcy proceeding, for example, by, for example, fraudulently concealing significant assets, thereby forfeits his right to obtain Chapter 13 relief in that case, bankruptcy relief. And the Supreme Court said yes. Why? This case is important because we can't use bankruptcy as a shelter for fraudulent misconduct. In the Velasquez case, the debtor did three things. He was a debtor who could have paid the State court judgment, pending State court judgment, out of his real estate assets. He would have had to liquidate them. Okay? He made some misstatements on his schedules, and his timing was he filed it just before enforcement. The same bankruptcy judge, Judge Bufford, sitting on the bankruptcy panel, said that was enough. That's bad faith. And this Court affirmed. Now, we have all of those factors here and more. We had two days before the enforcement hearing, the marshals filed for bankruptcy. They omitted major assets on their initial schedules. And also in the Velasquez case, the debtor said, well, I should be able to cure those problems later. And the bankruptcy appellate panel said, no, you don't have the opportunity to do that. You're playing fast and free with our bankruptcy system. Again, this Court affirmed. We have those factors here. Yet we have the same judge reaching completely the opposite conclusion. I respectfully submit, you have basically identical facts and opposite conclusions. There's something wrong with the application of the standard in one of those cases. And what this Court and the Supreme Court has done is it has given us, it has told us exactly what we should be focusing on. In Marsh, the fact that the debtor could satisfy the judgment out of her property, the same thing happens here. There are no business assets involved here. These are personal investment accounts, a personal property of the individuals. The fact that she could have satisfied it, she filed her bankruptcy right on the eve of her bankruptcy case on the eve of enforcement, that alone satisfied that faith. Here we have a problem which the Bankruptcy Court did not even address, which we argued below. There's a lack of unsecured debt. There's only $16,000 roughly of unsecured debt. And as this Court held in St. Paul's Storage, that's a relevant factor. The bankruptcy judge completely ignored it. That was also a relevant factor in Shue and in Boynton. It underscores that the trust, the fraud judgment here is over 80 percent of the liabilities. Now, one thing the bankruptcy judge also did that was a mistake, it was an error, was wrong as a matter of law, is he said, well, I'm not going to decide whether they're solvent or not, but they're in financial distress. Of course, all of the other debtors where their cases were dismissed were also suffering financial distress, so that's not really relevant. But he said, okay, there was some threatened liability of $100 million, a letter that had been sent to the debtor. So maybe that does it. But that's not so either. Under this Court's decision in U.S.A. Motel, a very old decision from 1971, but also adopted and applied by the Third Circuit in SGL Carbon in 1999, in order for a liability to count in this analysis, it must be imminent and certain. You can't say there's a speculative liability out there, and that is sufficient to say, okay, you need bankruptcy relief. In U.S.A. Motel. Imminent and certain to mean you only count claims that have been formally filed? Not just claims that are formally filed. Yes or no to that? No. Would you say it's not, cannot be imminent or certain if it's not actually filed? It's a, a claim can be imminent and certain if it's not actually filed, because we actually do this analysis before the deadline for filing claims arises. No, I don't mean filed in the Bankruptcy Court. I mean a claim. Oh, in lawsuit or something? Yeah, yeah. That doesn't have, that's correct. But it has to be something more than a mere threat. Because in U.S.A. Motel, this Court said, look, the fact that you might have these liabilities that have been threatened, that doesn't mean it's imminent and certain. There's no bright line that you're arguing for claims asserted outside the bankruptcy context as whether they're imminent or certain. Well, actually. It's a judgment call that the judge has to make. Not quite, Judge Ebel. In the Third Circuit, you had a situation where there was an actual lawsuit filed. The debtor was in the middle of the lawsuit. And the lawsuit might have resulted in hundreds of millions of liabilities. They were actively defending it. And the Third Circuit said, that's not imminent and certain. We don't know how the lawsuit's going to come out. Your bankruptcy petition is premature. So here, we didn't even have a lawsuit filed for the $100 million threat. Well, there wasn't a lawsuit filed by Mr. Marshall's brother, Pierce Marshall. But there was a lawsuit, a Louisiana lawsuit. Yes. That was already filed. And Mr. Howard Marshall was a named defendant at the time. Correct? Judge Wendt, no. It was dismissed. And as Mr. Howard Marshall testified in the proceedings below as part of the record, he was not actually a litigant when all of this was happening in the bankruptcy court to any threatened $5 million liability. So it doesn't meet that standard. So the bankruptcy judge improperly looked at those things as well. But I think what's important to underscore, again, is that you have factors which this Court, the Supreme Court, other courts, this Court repeatedly, case after case after case after case, has said are important. The bankruptcy judge here said were irrelevant or immaterial or were not something which the Court would pay attention to. So the argument that Judge Buffer made and Judge Carter also made in response to that, I mean, obviously bad faith means for reasons that aren't legitimate purposes of the bankruptcy law. And they both said that the Marshalls had no reason to know that Pierce wouldn't actually file a proof of claim in this bankruptcy proceeding. In fact, Pierce was listed as a scheduled creditor, right? So they were proceeding on the assumption that he would file a claim and that they would have to pay something on it. And they could have paid it if they hadn't filed for bankruptcy. They would have had to sell their assets. But this is what they were doing. And this is the same dynamic as in Marsh. Instead of posting an appellate bond, they decided to file for bankruptcy. And you can't do that. Let me ask you this. Step back. Why didn't Pierce just file a proof of claim in the bankruptcy proceeding? Because the last time Pierce filed a proof of claim in front of this particular bankruptcy judge, he hit Pierce with an unconstitutional nearly $500 million judgment based upon allegations of discovery abuse that were never substantiated, which this court overturned, the Supreme Court said was unconstitutional. The judge had such antipathy towards Pierce, which is why the debtors steered their case to this judge by their improper addendum they filed with their case. No, I think their addendum was pretty proper. It said technically this isn't a related case, but this district court judge has knowledge of all of these parties and whatever. They said there was no technical satisfaction of the related case rule. Correct Judge Wardlaw, but that should have been the end of it. What actually happened was because they filed this improper addendum, the clerk pulled it from random selection and she assigned it to Judge Buffert. That's what the clerk told us. And when we asked Judge Buffert if we could please prove that, he refused. He would not let us call the clerk. He wouldn't let us take discovery. But this was improper. And the only reason for filing this addendum, the only overlap between the two cases was Pierce. There was no overlap with the facts. There was no overlap with the parties. Howard III's bankruptcy is completely different from Anna Nicole Smith's bankruptcy. The legal issue is the same. The fraud judgment was completely different. Actually, the fraud judgment comes out of the probate court proceedings, which the Supreme Court said should have proceeded instead of the Buffert bankruptcy proceedings in the first place, right? And preempted. Wait. Am I right? Am I right about this? In part, Judge Wardlaw, in part. That's how they're related. In part. But the claims in the probate proceeding were completely different. All the allegations underlying those claims were completely different. Her claim was for tortious interference. The claim against Howard III was for fraud. Completely different facts. There was no overlap except for Pierce as between the two bankruptcies. That was improper. I see my time is almost up. I'd like to reserve some time for rebuttal. If you thought, or if Pierce thought that Judge Buffert was biased against him, why didn't he move for recusal in the Vickie proceedings? Because he didn't know until the end of the Vickie proceedings the magnitude of the grounds for the recusal when he was. But part of your claim here starts out with his talking to the press and explaining the procedures for getting documents. I mean, he moved that at the beginning of the proceeding. Well, not exactly good for a lot. It was cumulative. It was cumulative. Of course, the big thing, of course, was getting hit with a half a billion dollar judgment for alleged violations of discovery that Pierce did not in fact commit. That was a big problem. That, of course, didn't come until the end. Right away when this case got filed and it seemed the debtors were steering their case to the same judge for the same reason, there's no other explanation for the addendum than to try to steer it to the same judge. Pierce filed a motion to recuse and pointed out all the various reasons why the judge should recuse. And there were basically, they fall into six categories, one of which was. You don't have to read them all. It's okay. Yes, Your Honor. I just say save your time for rebuttal. Yes, Your Honor. Good morning. May it please the Court. David Neal on behalf of Howard and Eileen Marshall. Can I just ask you a question? Given all the history of this case and all of the, you know, how it went up and it turns out that Judge Beffert shouldn't have even been handling this case, how do you feel about the fact that Judge Beffert should have been handling aspects of that case in the probate court in the first place? Wouldn't it have been better if Judge Beffert had just let it be reassigned to another judge? I mean, we certainly wouldn't be facing all of the, I mean, I'm not sure he was required to, but I'm sure it would have been better. We wouldn't be facing all these arguments. Well, Your Honor, Pierce is sort of schizophrenic on that argument, because on the one hand he says this case is not related to the Vickie case. It has nothing to do with the Vickie case, in which case Judge Beffert's participation in the case would have no relevance, because if it's a completely separate stand-alone case, the fact that it was assigned to Judge Beffert by the clerk, whether it was intentionally or randomly, wouldn't have made a difference. The problem with that is that they say they spent about 25 percent of their brief talking about a case which they claim was not relevant to this case. So they're arguing both sides of the coin on that front. There's nothing, even if Judge Beffert accepted the assignment of this case, which he did, the issue comes back to a demonstration of actual bias or prejudice, not theoretical bias or prejudice. Whether Judge Beffert should have recused himself, might have recused himself under other circumstances, would have acted differently, I don't think is the analysis. And I think what we've got here is, as counsels basically acknowledge to the Court, a fear of future bias, that there was a concern that because of how Judge Beffert acted in this other case, that that same animosity and hostility would be transferred over to this case. So ironically, because he failed to file a proof of claim, he cannot prove actual bias. That's exactly right, Your Honor. And in fact, the record is to the contrary. Because he did not file a proof of claim, there's a reasonable argument to be made that he lacked standing as a party in interest at that point. He had no right to participate in the voting on the plan. He had no right to a distribution out of the bankruptcy estate. And so the argument we made to Judge Beffert was that he should not be permitted to continue to participate in the case. And Judge Beffert actually ruled to the contrary. There is some case law contrary to you on that, I think, isn't there? There is, Your Honor. And the question of what's a party in interest is a broad one. What is the status of Pierce's other litigation right now? With regard to the Vickie case? Yeah. Your Honor, I'm not involved in that case, so I have no idea what the status of that is. Our case was predicated on a certain set of facts which stemmed from the same litigation or similar litigation, but is not the same litigation. So my clients were not a party to the litigation that resulted in the various chain of Supreme Court's decision in the Stern v. Marshall case. What's the substantive basis for the fraud judgment? What's the alleged fraud? The allegation is that there was – I believe that there was interference with an expectancy or – I wasn't counsel in the estate litigation either in Texas, so I'm not particularly well-versed on – But there's something about the fraud judgment since it was just discharged in this case. My understanding, Your Honor, is that there was an argument about interference with the will process in some way and that the judgment was rendered against my client. There was a motion for a judgment non-abstante for a dicto. The judgment was reduced. My client filed an appeal from that judgment, which has been stayed by virtue of a bankruptcy case. So this is all – we've been closing – Didn't he have to file a bond to file the appeal? Your Honor, the bankruptcy case was commenced. If Pierce wanted to argue that he still needed to post a bond in the Texas court, he could have sought relief from stay and made that argument in the Texas court. That argument was never made. Those set of facts never occurred. What we're dealing with is a bankruptcy case that was filed not just to address that judgment. I want to – I did want to just address one point that counsel made, and that was that there was a question, I believe, from Judge Wann about a litigation pending in Louisiana, and counsel said, oh, no, that litigation was dismissed. Well, in reality, I believe that litigation was dismissed post-bankruptcy. At the time the bankruptcy case was filed, in fact, that litigation was proceeding, along with two other matters that involved these same parties. From the perspective of my client, this was not a sort of theoretical threat that there was going to be a $100 million lawsuit brought against them. This was a litigious brother, scorned by – for whatever reason, who had filed numerous lawsuits against my client. They received a threatening letter that indicated yet another $100 million lawsuit against them. Under the circumstances, I don't think it was unreasonable for them to conclude that this was a legitimate threat, and that this was going to continue to go on unless and until there was an opportunity to try to adjust these claims and address these issues in a bankruptcy case. When did Pierce, the person Pierce, pass away? Was it during the course of these proceedings? I believe it was after, Your Honor. It was after the bankruptcy was filed? It was after the bankruptcy was filed, for sure. I'm not sure at what point, what year he died. Let me go back to the recusal motion for a moment, because earlier you mentioned in your argument that there's no showing of actual bias or prejudice, but that's really not what's required. It's the appearance of an impropriety that's really at issue in this case, right? Yes, Your Honor. I think that's the only mistake. I think that's what they're trying to do by marshalling together the facts with regard to the Vicki Lynn Marshall case, the attempt to show that there is an appearance issue in this case. Right, and I think the question would be, would a reasonable person look at the situation and conclude that there was an appearance of bias? And as I said, Your Honor, there was nothing that happened in this case to indicate that Judge Buffert was biased against Pierce. He allowed them to participate in the case. The decision that they made not to file a proof of claim is ultimately what led to conclusions that were reached in the case. The fact that we went forward with a plan of reorganization that didn't provide for Pierce was not because Judge Buffert had some great animosity towards Pierce and was precluding Pierce from participating. But he did do a couple of unusual things with regard to the handling of the Vicki Lynn Marshall bankruptcy, like holding an impromptu press conference. That doesn't happen every day. Well, and, Your Honor, again, we weren't participants in that case, and clearly the presentation of the facts is extremely one-sided in the briefing. Had we been counseled to Vicki Marshall in that case, I'm sure we would have been in a position to address more precisely what happened in that case. But since we weren't, and my clients weren't involved in that case, again, we're just not in a position to rebut that. However, Judge Carter was the appellate court, the initial appellate court in that case. And what's interesting is that despite this claim of extreme bias by Judge Buffert, there was never any issue raised on appeal about Judge Carter's participation in the case. And what's interesting about that is that although Judge Carter reduced certain aspects of the award against Pierce, he actually increased the punitive portion of the award. He doubled it. So if we're going based on apparent animosity or apparent hostility, then the same issue should have arisen with regard to Judge Carter as it did with regard to Judge Buffert. And that was never raised. The other aspect of that, Your Honor, is that normally if you have an actual concern about what's going to happen in the case, you don't wait two months to file a motion to recuse or a motion to reassign the case. The case had been pending for two months at the time the motion to recuse or reassign the case was filed. The bankruptcy plan was filed in the first 120 days of the case. This is unlike the Marsh case 100 percent, because in Marsh there was no clearly rehabilitative purpose that was being sought by the debtor there. It was purely and simply a litigation tactic. Here, the original plan that the debtors filed actually contemplated a termed payout of all of their debt, including the judgment. The assumption was that Pierce was going to file a proof of claim and that that claim was going to have to be addressed in the plan as a disputed claim, an allowed claim, whatever it was ultimately determined to be, was going to have to be addressed in the bankruptcy case. We were not, my clients were not in this bankruptcy to avoid the judgment. My clients were in the bankruptcy in order to address the judgment in a way that freed them from hundreds of millions of dollars of continuing litigation and continuing threats of litigation. The fact that the plan was filed in the first 120 days of the bankruptcy case is, I think, informative. If the only objective here was to stretch out creditors and to avoid paying the judgment, why go forward with a plan in the first 120 days of the case? Why try to go forward and try to resolve the claim through the plan in the first 120 days of the case if the intention was just to simply put creditors off and avoid payment? That clearly was not the case, was not evidenced by anything before Judge Bufford. And I think Judge Carter correctly found that there was simply nothing to suggest that bad faith was at issue here. I wanted to address the schedules issue because I think this is much adieu about not very much. First of all, I definitely contest the characterization by counsel that there were misrepresentations in the schedules. There's no question there were mistakes in the schedules. But you address mistakes by amendments. And there's nothing sinister about amending schedules. Bankruptcy Rule 1009 specifically provides the debtor an opportunity to amend schedules at any time until the case is closed. So if the initial schedules are such a critical thing to the analysis of whether or not the case was commenced in good faith, why does the bankruptcy rules allow that those schedules can be amended at any point during the case? Who actually prepared the schedules? The schedules were prepared by counsel with obviously the information from the debtors. And it's the debtors that sign the schedules under penalty of perjury. Once there were issues that were identified, this is a damned if you do, situation. I'm sure had we included information about stock value on one particular day, we would have been criticized that it was inconsistent with the stock values on a different day. This was not an instance where Pierce was really looking for information from the schedules that he otherwise didn't have. This is an example of sort of a gotcha mentality. The schedules are really just notice pleadings. They're intended to put creditors on notice of what the substance of the estate is. This comes up in real estate cases all the time. Debtors file schedules that identify the value of what they perceive to be the real estate in a real estate case. And I've never had a case in 25 years of practice where a secured creditor walks in and says, you know what, we agree 100% that that's the value of the property. So, I mean, valuation of assets is usually at the core of bankruptcy. And that gets into the best interest of creditors test that was referenced in standard. And that's typically where the issue of valuation is litigated. Are creditors getting as much under the plan as they would get in a liquidation of the estate? That's where valuation becomes relevant. Until then, the filing of the schedules is only relevant because it's supposed to put creditors on notice. Your claim is disputed. Your claim is unliquidated. Your claim is contingent. You need to file a proof of claim under Rule 3003. That's what the purpose of the schedules is. It's to give notice to creditors to say, we believe we have this pool of assets. There may be some that are unliquidated. There may be some that's very difficult to value. There may be some that are subject to so many contingencies that the best we can do is just describe those contingencies and say that the asset is of unknown value. That's very different from what's been characterized as a presentation of an asset with no value. This came up with regard to the debenture. The debenture, in fact, was very thoroughly described in the schedules. And the limitations on the ability of my clients to access the principle of that debenture were very clearly laid out in the schedules. We didn't say that it has no value. We said that it's subject to all these contingencies and that there was real question about how you would go about accessing the principle to be able to create value for creditors. That brings us also to the point, Your Honors, of the allegation that, well, my clients could have just sold assets and paid the judgment. But let's be realistic about what that means. That means selling their residence, selling every single one of the assets that they had, their stock portfolio, interests in businesses, whatever they had, they would have had to sell in order to address this judgment. In addition, that doesn't take into account considerations about the tax ramifications of that kind of a sale. If my clients had to sell off a stock portfolio and all we did was say, okay, the value of the stock trading on a particular day was this, therefore, the liquidation value of the stock is that, and you should have that cash to pay off your creditor. That doesn't take into account any aspect of reality in how these things work. If the debtors had to turn around and sell their house in a fire sale, they had to turn around and sell their house in a 30-day period in order to satisfy a judgment. They had to sell off their stocks and other assets in a liquidation mindset where everything had to be done quickly to satisfy the judgment. The question is, at that point, would the debtors have been left with anything? And I think the answer pretty clearly from the schedules is no, they would not have. And they would not have been insulated from the claims of other creditors. So even if they went ahead and liquidated all of their assets, and as counsel suggests, they had just liquidated everything and paid off the judgment, that wouldn't have disposed of the other litigation that they were dealing with. It wouldn't have disposed of their obligation to pay living expenses. It wouldn't have disposed of the obligation they had to pay continuing legal expenses based on these other lawsuits that were being filed and were being pursued against them. So it's just not reality to suggest, as counsel has suggested, that this is just simple. You just take the assets, you sell them all, you pay us, and what's the big deal? Why are we in bankruptcy? If that were the case, there would never be a personal bankruptcy filing because all debtors should do is just sell what they have, pay its creditors, and, you know, whatever creditors get, they get. The reality is that bankruptcy is not predicated on this balance sheet concept that Pierce has been advancing. The reality is that bankruptcy contemplates cash flow insolvency-type concepts. The few instances where insolvency comes up in the Bankruptcy Code, in Section 109, which deals with the ability of a municipality to be a debtor in a bankruptcy, and in Section 303 that deals with involuntary bankruptcy cases, the solvency analysis is confined to cash flow, whether or not the debtor is capable of paying its debts as they come due. Under that standard, to argue that my clients were solvent as of the petition date because on a balance sheet basis, without regard to liquidation reality, without regard to taxes, that's just not reality. That's just not life in the real world. If there's an analysis of solvency that matters at all, which we submit it doesn't, there's no requirement that a voluntary debtor in a Chapter 11 demonstrate insolvency. If there's any sort of concept or a consideration of insolvency, what the court should be looking at is, what is the impact of these claims on the debtor's ability to pay their debts? Can they survive if they have to deal with these claims? Judge Buffert very carefully considered those allegations. He very carefully considered the reality of the history of this case. He very carefully considered the reality of the other litigation claims that were being pursued against the debtors. He looked at the totality of the circumstances, which is exactly what a judge is supposed to do with regard to a motion to dismiss. There's no one critical factor, and to the extent that factors are being identified by counsel, many of them arise in what we call the single-asset real estate context, and that's where a debtor owns one piece of property, has no real unsecured creditors, files a bankruptcy case on the eve of foreclosure, and essentially uses the bankruptcy as a way to forestall creditor action, and that's the Little Creek case that the peers cited extensively in its papers. Now, Congress addressed that. Congress amended the bankruptcy code to put further restrictions on single-asset real estate debtors. They made a very abbreviated time period within which a single-asset real estate debtor had to file a plan or begin paying debt service payments to the secured creditor. So this perceived abuse that counsel is identifying about, well, there are only a few creditors, to the extent that that was relevant, it was relevant in the single-asset real estate context, and to the extent Congress viewed it as being relevant, they amended the bankruptcy code to address it. Can I ask you just sort of a practical question, sort of procedural, because it seems odd to me? So the plan was confirmed in 2003, and then the courts did not order a stay of the confirmation pending appeal. So then Judge Carter didn't issue his order until 2009. So during that period of time, confirmation was in effect, correct? Yes, but the plan could not go effective because of the stay of this court. I thought we didn't issue a stay until 7-27-12. No. Okay, there's a prior stay. More history. Okay, that's what I'm confused about. Yeah. So the plan, the confirmation plan is not in effect. It has not gone effective. Judge Carter denied a motion for stay pending appeal, but he granted a temporary stay for peers to come to this court to ask for a stay. This court granted a stay or actually held the case in abeyance, I think were the words used in the order. It was held in abeyance pending the outcome of the Anna Nicole Smith case. Once that case was resolved, the issue of the stay came up again, and that's where we got these orders recently that came out of that. Was it held? Did the court, did we give a reason why we held it pending? Unfortunately, no, Your Honor, and we actually at one point moved to terminate the stay so we could go forward with consummation of the plan. My clients have been waiting for almost ten years now to pay off their creditors and have this case be concluded. They continue to have to pay U.S. trustee fees. They continue to have to address issues in the bankruptcy context when this case was essentially decided and all the fighting was concluded ten years ago. Yet because of the stay of this court and because of the continued appeals by peers, my clients have been held in this limbo for the last ten years. Under the circumstances, we say that, to the contrary, I think, Judge Wen, you had it correct, that Judge Buffert did carefully evaluate all of the relevant factors. Pierce just didn't like the way he came out on them. That was evidenced, I think, by Judge Carter's ruling as well. We had five days of oral argument, which I've never in my career seen before, but Judge Carter was extremely accommodating with regard to the oral argument. He allowed parties to go through the evidence that was before Judge Buffert. It was not simply a legal argument that lasted 20 minutes or 25 minutes. It was a five-day presentation of each side's position. So to suggest that Judge Carter somehow missed it, I think, is not appropriate or not borne out by the facts. With regard to the final sanctions order, did Judge Carter make specific findings as to whether they were warranted or not? Because now the parties are still before us disputing whether the sanctionable conduct did or did not occur. Your Honor, that's a great question, and it's not our case. I don't know. The Supreme Court decided the Stern v. Marshall issue. It went back. I'm not sure what the status of that is at this point. Judge Carter made findings that there were discovery abuses. He made findings that there was conduct that warranted a punitive award, and he doubled the amount that Judge Buffert had awarded. What's happened to that in the interim or what's happened to that subsequent to the Supreme Court, I just don't know. We are not tied into that case. We are not part of that litigation. So the fact that Judge Carter increased the sanctions award because of his own findings, and he published an opinion on it, too, I believe, because of that finding, Pierce was subject to that additional punitive damages award, and that's what kept going on and taking it up to the Ninth Circuit, to the Supreme Court, back to the Ninth Circuit, and so on. All right. Thank you, Counsel. Thank you very much, Your Honor. Judge, when those sanctions orders were vacated, they are no longer in extant. Judge Carter did not make findings that Pierce engaged in discovery abuse. The bankruptcy court's discovery abuse order was vacated by the district court, the court of appeals. This court basically concluded that the bankruptcy court in the Anna Nicole Smith case did not have jurisdiction to finally enter a judgment against Pierce. That was affirmed by the United States Supreme Court, and this court concluded that the proceedings in the probate court alone were dispositive and should have been recognized as dispositive below. Judge Carter's decision was vacated. Judge Buffert's decision was vacated. None of those sanctions are extant. We won on the standing issue below, and at ER 87, the bankruptcy court ruled in our favor, saying you don't have to file a proof of claim to object to the plan, and you don't have to file a proof of claim to object on bad faith. They did not cross-appeal that decision to this court. It's not properly before the court, and they would be wrong on the law anyway. The proof of claim issue is a red herring. What you heard was a very nice story from counsel about bankruptcy and mending the schedules. All of those arguments were considered and rejected by Judge Kosinski in the Marsh case. The debtor in Marsh went through the same thing. She would have to sell her assets to pay off the State court judgment, and the court said that's too bad. Bankruptcy is not available for people who just don't want to pay a State court judgment to come and basically shelter their assets and avoid having to post an appeal bond. Now, with respect to the schedules, again, the reality is that in January of 2002, Howard had no trouble in his probate court affidavit valuing all of his assets, listing them all properly and saying, I'm worth $22 million, which was completely accurate. Then a few months later, he omits his assets. He redacts the valuations on the same schedules. He simply cut and pasted for the schedules, and he said, no, I'm only worth $8.3 million. By omitting the $6 million debenture, the debenture wasn't even mentioned in the initial schedules. And you can't say, I don't think it's fair to say, that this is simply a mistake. This violates the entire spirit of our bankruptcy disclosure procedures. As the Supreme Court said in Marama, bankruptcy is for the honest but unfortunate debtor, and relief is limited to that. And the bad faith standard circumscribes when we close the door on bankruptcy because somebody is filing it for an improper purpose. And it is an improper purpose, according to this Court's decision in Leavitt, this Court's decision in St. Paul Storage, this Court's decision in Silberkraus, and this Court's decision in Marsh, where basically three things happen. The debtor is hit with a state court judgment. The debtor has significant assets but doesn't want to liquidate them to satisfy it. And instead of pursuing an appeal or posting a supersedious bond, comes to bankruptcy court. And the timing is suspicious. All those things happen here. In all of the other cases where that's happened, there's been a finding of bad faith under the correct legal standard, where all of those things are significant and should be considered. Here Judge Buffert said, no, solvency doesn't matter. It's immaterial that you made all these omissions and misstatements in your schedules. It doesn't matter the timing. The schedule is ultimately corrected. In part, but only after the 341 meeting where the United States trustee got involved and we came and we said, hey, you're not being truthful about your schedules. You're playing fast and free with the bankruptcy system, trying to give an appearance of a need for bankruptcy relief when you don't need it. Then they filed their amended schedules. And in contrast to the $22 million figure they put on all the popular listed assets in the probate court, they then said, oh, lo and behold, our liabilities are $13 million, $13.9 million, and our assets, the value is really just shy of that. Again, they gave no value to the $6 million debenture. So you're well over your time. So I think we're going to have to ask you to submit at this point. Thank you, Your Honor. You've got all of your briefs on this. Henry Marshall is submitted, and this Court is adjourned for this session.
judges: Ebel, Wardlaw, Nguyen